The next case is Norfolk Southern v. Basell.  Good morning. May it please the court, my name is Paul Keenan. I represent the appellate Norfolk Southern Railway. I respectfully request two minutes for a vote. Fine, fine. We don't get too many appeals from the winners of summary judgment. We realize you didn't get the relief that you wanted. This is a case about a shipper that agreed in a contract with a railroad to ship 95% of its freight with that railroad for 64 months. But after 36 months, repudiated that contract by signing another contract with another railroad to ship the same 95% of the same freight with that second railroad. You didn't find out about that contract until right before the summary judgment motions were filed? It was in discovery, that is correct. Prior to that, you were just declaring breach and seeking just general damages? It would be one thing if the shipper was slipping a few railcars with another railroad and not meeting its 95% requirement. That would be a garden variety breach. But signing a second contract to send 95% of that same freight with that other railroad is a textbook repudiation. Is it clear that they couldn't comply with both contracts? Yes, and I think that's proven by the fact that they were found to have been a breach and were awarded damages that were projected and calculated by the district court. But the district court here found that the minimum volume commitment applied to the aggregate of all rail traffic originating in West Lake Charles without distinguishing between the two different types of rail traffic, the competitive and the solo, the captive solo. That seems to be a central holding. Why is that wrong? It's not wrong, but it's also a standard in the industry to do that. Of course, each railroad has a published tariff for every destination that it services, and the party is trying to beat that tariff by promising a certain volume. Now that gives the shippers some flexibility to do it in the aggregate so that the shipper does have some ability to move some traffic in another direction as long as it met the aggregate. However, in this particular case, the shortfall was about half of what it had promised. It was in the 40 to 55% range of the competitive traffic on the one year. The one year that we measured, we don't know what happened from that point forward. We're now contemplating a second lawsuit because we don't know what happened after June of 06. Clearly, they couldn't comply with both contracts at the same time, which brings me back to why it's a classic repudiation. Is there evidence in the record that Basel knew when it entered into the contract with CSX that it would therefore have to breach the Norfolk Southern? Is there evidence in the record as to the obviousness or state of mind as to that fact at the time that it entered into CSX? I believe there was deposition testimony of a CSX representative. I can't... Then Mr. Basel said he could not satisfy the 95% requirement to both CSX and Norfolk. Correct, because the 95% for Westlake Charles, it's a defined point of origin. He couldn't possibly do it. He couldn't possibly do it. You can't get 95% from the same point of origin. Even in the aggregate, he just can't do it. So you would say Basel knew when he entered the CSX contract that he was going to breach the Norfolk contract? It's readily apparent. I guess what was disturbing was that in the district court, there was a position by Basel that they might still theoretically grant 95% to NS. Of course, that would be a breach of the CSX contract, but that's not of concern here. But that position taken by Basel is actually an illustration of the restatement on repudiation. That's a classic repudiation. If A agrees to sell land to B, in April, A agrees to sell land to B in July, and then in May, A agrees to sell land to C, the act of the second contract is a repudiation of the first contract. But the district court didn't address the repudiation issue, did it? No. And that is very puzzling to me. You didn't really raise it in your complaint. You raised it in a letter just prior to the trial date. Correct. It was raised when the issues were simplified and the court directed the parties to file cross motions. It was in the cross motion. It was argued. It's discussed in the argument at A51. And they didn't raise the fact that it wasn't pled and should therefore not be? No. I think the position all along has been it came up late. Now, do you object to lost profits determination of the district court? The district court found you were entitled to lost profits. Have you appealed from that aspect of the district court's ruling? As to the calculation of lost profits? As to the fact that that's what they found was the measure and was appropriate for you to be entitled. I mean, they gave you lost profits. And they even gave you, and I have a question, they gave you future profits. I'm not even sure this judgment's final. Have you all decided what you're entitled to for the last year or so? Your Honor, I have no idea what cars were moved in May of 2007 with respect to Bissell. Which illustrates the whole point of why at the very least it's a material breach, if it's not a repudiation. Well, I guess there's two points to my question. The first is the district court did give you lost profits. The calculation, interestingly, the idea was, well, the lost profits that you proposed versus the lost profits that they proposed were close, so it's easily calculable. I don't know why close makes it easily calculable. But then the order says, and guess what, you'll have future lost profits. But that's not detailed. It's not awarded. It's not been awarded. Do we have a final order? It was a snapshot based on projections in 06, which underscores why it's a material breach or repudiation. Were the damages awarded the discounted damages or the damages you were seeking, actually, were the common carrier damages? Correct. We wanted the tariff rate imposed from the point of the second contract. And the court allowed the contract to continue and used the contract as a measuring stick through the projections of 06. At the discounted rate. At the discounted rate, which was the essence of the contract. So those are the damages that you are seeking on appeal. The tariff rate. You wanted us to conclude that the breach was material so that you would be entitled to the tariff rate. What is the difference economically? There's a significant increase in the tariff rate over the contract rate, which, let me put it to you, the best way to illustrate this is there is a significant difference. And I want to underscore that Norfolk Southern felt it was so important to get this competitive traffic that it sacrificed that tariff rate for all the captive traffic that it was going to move to get the competitive traffic because there are operational efficiencies for railroads. It doesn't cost that much more to add 10 more cars on the back of a 20-car train. There's operational efficiencies at stake. So they really wanted the competitive traffic. Yeah, it seems to me the argument you're making is that requirements contracts such as this are different. That 95 percent, I mean, getting 95 percent of someone's traffic in and of itself, that's what you really wanted. And that was the quid pro quo. And yet there doesn't seem to be an analysis in the district court's opinion or in the briefing as to why a requirements contract isn't just I will buy these widgets at this price. And it seems to me there ought to be some case law, and I don't see anything here, as to requirements contract being different. And that would undercut, to my mind, the district court's conclusion that damages are easily calculable rather than looking at, well, the benefit of this bargain was 95 percent, and that's really, really important. The damages are not calculable for a number of different reasons. But just the railroads are different than other industries. It's hard to analogize sometimes to a widget case because it's actually easier, though, in the context of a remedy here because if the discounted contract rate doesn't apply, there is a published tariff rate that everybody knows that would apply automatically. It would have applied if the contract rate wasn't in effect. It makes it easier, actually, to say it's a material breach if not a repudiation. Well, tell us again. I'm sorry. I'm sorry. Well, on the breach issue, the district court held that it wasn't material for a variety of reasons. Why do you say it was a material breach? Why was the district court wrong in its conclusion? If you look at all five of the factors mentioned in the restatement, the district court grasped hold of one, which is the adequacy of the compensation issue. And even there, that's flawed because of the compensation issue going into the capital projections, This was done in summary judgment. This was done in summary judgment. Now, material breach is also a factual issue, which makes it a little more complicated. I tend to think it's repudiation, which makes it a very simple issue of law. But material breach is a fact issue. Although this is going to be a non-jury trial. Correct. Correct. The five circumstances to be considered are not rules. And the extent of the deprived expected benefit is key. Because the expected benefit to NS is to capture that competitive traffic. And that's been obliterated by the CSX contract. And that is the key element of the five circumstances. The adequate compensation is projection and speculation. The forfeiture is not an issue in this particular case, as noted by the district court. The likelihood of curing the failure, you can't do 95% on two sides. And if you could, CSX would. What is the term of the contract again? It runs 64 months through May of 07. Well, that was the other thing. The court said there was substantial performance, but the breach occurred in 05. So the breach was 60% along the way, but there still were two years to run. 36 months down, 28 months to go. Let me ask for a point of clarification. Appendix 16, we have the court's order, or actually 15. And the order grants the motion and then says, if any lost profits are incurred by Norfolk due to Basile's breach of its minimum volume commitment between July 06 and the completion of the contract, May 31, 07, Basile shall be liable to Norfolk for those lost profits. What has happened in that regard? Has there been a proof and an understanding and a payment? Norfolk Southern received two checks from Basile during this period of time. I don't have the car movement records. They more or less served as judge and jury for determining what those two checks were for. They were for modest amounts. I mean, is there an ongoing dispute about that or not? Well, we would have to look at the car movement records to see if they're anywhere near accurate because we have no idea how these – when somebody's serving as judge, jury, and writing the check, you just receive the check and you go, what was this based on? Where are the car movement records? Have you made any further filings before the district court with respect to this aspect of the order? Not at this time. We thought it would be more efficient to proceed with the appeal because the contract just ended. So this matter could continue to be before the district court arguable? Correct, which underscores why this fits within the criteria of material breach. You asked for a specific ruling on repudiation in the district court? The district court simply overlooked it. The district court's explanation at oral argument, which appears at A51 on repudiation, the district court said, I just don't want to terminate the contract. Didn't the district court say something along the lines with it wasn't a slap in the face that they're arguing it was? Yes, I do remember that line. I mean, that could be something to say they weren't really actually repudiating in the way that's being used. Right, but the act of the second contract conflicting with the first is – What is still open in the district court? Or is anything open at all? Just the one sentence that Your Honor mentioned is hanging at the end of that order. We're not exactly sure how we would go about getting proof, evidence, and ruling on that. It's kind of a procedural enigma. And is it entirely – is it a damage issue? If lost profits under the discounted contract were to continue to provide the standard for measuring damages, then yes, it would be a damages issue. Calculating how many movements there were, how many cars got diverted to CSX that could have been serviced by NS. Come back to an earlier question. Do we have a final order of the district court here? I don't believe we do with respect to that one component of the remedy. Although you haven't urged that, have you? No one's really raised the fact that there are disputes. No. In our argument to the district court, we took the position that we would have to file a second lawsuit. And at the very least argue collateral estoppel on some of the issues. But as a practical matter, we're here before this court because we believe that there was classic repudiation of non-material breach. We understand that. We're always obligated to determine our own jurisdiction. And if there's not a final order, we'll decide that we don't have jurisdiction. In any event, you would like this matter to go back on material breach, and you would like to have a full trial on this issue and say there are genuine issues of material effect. If not the ruling on repudiation based upon the obvious facts. All right. Okay. We'll have you back on rebuttal. Thank you. Thank you, Mr. DeWitt. Thank you, Your Honor. May it please the Court, my name is Nicholas DeWitt. I'm here on behalf of a colleague of his. Let me deal with several things that the Court has asked. First of all, the judge's order, the district court judge's order did provide for a payment to the Norfolk Southern after the contract, after the court proceedings were done. Giselle made those payments, one payment in February of this year, one payment in July of this year. Were they accord and satisfaction checks? Yes, Your Honor. What occurred here is this calculation is a very simple calculation. It basically requires taking a look at the universe of traffic, taking 95 percent of that, and having a map to exclude moons that are outside of this 100-mile rule within the contract. But didn't you both disagree on the amount of lost profits on what had already occurred? Not really both, but both calculations of lost profits were, as the Court said, very, very close. And what we did is the judge actually took the higher of those. Giselle's calculation of lost profits, 270,000, was actually higher than NS's calculation of lost profits. So all the district court did is to take that calculation of lost profits, which is higher than what NS asked for, and applied it to future movements along this contract. Were those losses based on the discounted rate or the common carrier rate? Those lost profits were based on the contract rate, not on the common carrier rate. The common carrier rate would have been much, much, much higher, and the damages for the result of the common carrier rate would have been more than the lost profits under the contract by many, many factors. We're talking probably millions of dollars here. So if there were a repudiation, then we'd be dealing with the tariff rate. If we were dealing with a repudiation, I think that is true, but that's the point that Your Honor raised. NS did not raise the repudiation argument, not actually before the trial at all. If you take a look at the record page, I believe it's 819 or 820, that was a letter that was sent to the court at 4.53 p.m. on the last business day before trial. That letter withdraws certain contract claims and asks for termination, but never mentions common carrier rates, never mentions repudiation. It was only after then, during a motion for summary judgment on June 13th, did, in a two-page short argument, did NS finally raise the repudiation argument there. Well, that occurred to me, and I thought it was curious that there really was no pleading setting forth the repudiation, but I don't see anything in the record, either before the district court or on appeal to us, that says the district court should not have considered that argument when it was made and how it was made. If you appoint me to somewhere where that was preserved before the district court and is an issue before us, I'd be happy to see it. I couldn't find it in the record or in the briefs to us that would have foreclosed them entirely from this argument. In Bazell's motion for summary judgment to the district court, it argued that all of these claims were just simply made too late, and I can point you, Your Honor, to the record there. But you haven't, have you said to us that the court should have therefore not heard these claims? I don't see that in your brief. The district court, cursory during the argument, considered the repudiation claim and simply dismissed it, and that was, frankly, the entire extent of the repudiation claim before the district court. Two pages in the motion for summary judgment, two days before the motion was heard after trial, and a short oral statement at the motion for summary judgment stage. Let me go on to one other thing. The question was raised by the court about whether these were the same origin or not, the two contracts, the contract between CSX and Bazell and the contract with Norfolk Southern and Bazell. The flat answer to that is they are not the same origin. The CSX contract with Bazell, let me just back up. When this case started, the allegations of Norfolk Southern took into account, encompassed three origins, Wesley Charles, Bayport, and two Canadian origins. The CSX contract with Bazell was primarily of the Bayport origin. Right before trial in the termination letter that I mentioned before, NS withdrew its claims as to Bayport and the Canadian origins, leaving only the Wesley Charles claim. Now, the CSX contract was mostly for Bayport. There was a small slice that dealt with truck transfer traffic out of the Wesley Charles. The NS contract was solely a Wesley Charles contract, so that you had two universes here, slightly overlapping, so that that's the reason why Bazell could tender 95% because it dealt mostly with the Wesley Charles traffic to CSX, but could tender 80% or more, as it turned out, subsequently to NS because the universes were separate but overlapped. Your 80% would still be a shortfall. Yes, the 80% would still be a shortfall. We concede that. But you also conceded that when you entered the CSX contract, you were aware that you would not be able to comply with the 95%. No, we did not concede that. No, we did not concede that. We said it could have been possible, or it could be possible, depending upon the amount of traffic, depending upon the two universes you have, whether one shrinks or falls, or the mix of traffic coming from both. I'm sorry. I misunderstood the deposition testimony. But then it's your view that you could comply with the 95% requirement of both contracts simultaneously? It would be possible to do that if the business conditions work, if the amount of traffic coming out of both origins grows or shrinks, and how much is coming out of each. All right, the statements made in the reply brief, you've not disputed that your contract directly conflicts, the contract CSX directly conflicts with the contract of NSR concerning the traffic and cites to the deposition of Slovak and also Kathy Rosenkranz, and e-mail correspondence is on page 17 of the reply. Maybe I need appendix references from you that say it really did not conflict. I think what you're arguing is there is a remote possibility that you could have performed both, but it seems to me the testimony of record seems that it's pretty sure there was a conflict. The Slovak testimony itself does not concede that there would be, that there is an impossibility of complying with both. In fact, the checks that I mentioned that Giselle sent, subsequent to the district court's order in compliance with the district court's order, the percentages are different that in subsequent time periods, Giselle was able to ship a little bit more than the 80% that it shipped from 2005 to 2006. But the agreement was 95%. No questions asked, 95% of all requirements would go to Norfolk Southern. We agree that we did not ship 95% of all requirements. But what they bargained for in terms of that reduced rate, which you yourself say is much, much, much, much less than the published charges, they bargained for 95%. So 80% isn't what they bargained for, is it? That is true. But the question is, does shipping 80% versus 95 or 87% versus 95 or 90% versus 95, does that justify termination? Was that a material breach of the contract justifying termination of the contract? And the district court found for the reasons going through the statement. But if you signed a contract at the time knowing that it was highly likely, if not for certain, that that 95% that you had already agreed to was not achievable, how was that signature of the contract with CSX not a knowing repudiation? Because I would not concede that it was for certain or not even concede that it was highly likely. I will concede. But I need record citations that support your position as to what was happening when you entered into the CSX contract. The testimony of Mr. Slovak, I believe, at page 341 of the record, What was the reason that you gave as to why you only hit 80% in 2000? The 80% of the traffic out of west-west Lake and Lake Charles, some of it consisted of rail direct traffic that Norfolk Southern had to ship. Some of it consisted of rail competitive traffic that Norfolk Southern might have been able to ship or might not, depending. And some of it consisted of truck transfer traffic. And it was the truck transfer traffic piece of that that was difficult to provide to Norfolk Southern because of the CSX contract. And as Mr. Slovak testified on deposition, you can only run a single truck fleet. And so there was a business reason there. But with that, because there was so much other traffic, rail direct traffic and rail competitive traffic, that it still would have been possible to ship the 95% if the business conditions were right, if the amount of total traffic out of both grew, for example, or that the amount of traffic that was going to each, that was coming from each origin was right. So we did not go into the CSX contract with the idea that we would reach the next level. Assuming that's a valid argument, why should the district court have decided this matter on summary judgment? Why shouldn't it have made findings of fact, conclusions of law? There were undisputed facts. And, in fact, if you take a look at the district court's order, every single fact cited by the district court in support of its order was either a fact that was agreed to by either parties or the district court credited Norfolk Sutton's fact so that the district court properly took, as the summary judgment requires, the facts most favorable to the moving party or undisputed facts. Norfolk disputes virtually every one of the five restatement factors that the district court analyzed. And of particular importance, perhaps, is whether you proceeded, you comported yourself with good faith and fair dealing. If you knew that entering a contract with the CSX would end up meaning that you can't comply with your Norfolk contract, how would that be comporting with the standards of good faith and fair dealing? We did not enter the CSX contract with the knowledge that necessarily we had to fail to comply with the Norfolk Sutton contract. It was possible we would not have been able to comply with the Norfolk Sutton contract, but it was not a foregone conclusion. And, as Mr. Slovak had testified at his deposition, it could have been that both contracts would have been complied with. You said 341, I believe, and I don't find that as his deposition transcript. Let me... I've got him at, like, 700. And if I might supply that to the court at the end of the argument, that's what I thought the page was, but I might be wrong. 341 is not a deposition. Thank you. All right, your assessment of possibility, that's based on history, your assessment of volume, your assessment of the parties' contracts and what the requirements are, what exactly is the possibility based on? Increased, perhaps, increased volume? It is based on the number of cars coming out of the Westlake Charles facility. It is based on the number of cars coming out of the Bayport facility and it is based on the number of cars that would have been truck transfer traffic. Are you looking back over the history of the contracts? And especially the time period from February 2005 to June 2006, which was the period that both parties were looking at as they were examining the possibility of breach. And based on that period, you thought it was still possible for you to comply with both contracts? Yes. The contract with CSX was entered at what year? February 2005. And you thought at that time that you could still possibly comply with both contracts? That's correct, and that's what the district court found. Let me raise just one more about my time. My time is up. Does the court have any other questions that he can answer? Just a little bit. We'll give you another minute. Okay. I would point out to the court here, just in terms of fairness and knowing with good faith that they're dealing on a forfeiture point, that Bazell, if the court credits NS's argument and permits NS to apply tariff rates to this, that amount of money is far in excess of the damages that NS would be entitled to under the contract. And what's more, I want to emphasize to the court that if there was no contract back, for example, in 2005, or if Bazell were to repudiate, for example, the contract back in 2005, it could and would have shifted much more traffic from NS than it actually did. What NS wants to do now is NS wants to apply tariff rates to movements that Bazell tendered to NS under the contract that NS would not have received but for the contract. So what NS is attempting to do is to get tariff rates that it would not have gotten but for the contract, but then also, but in a sense, take advantage of Bazell's compliance with the contract over these last two and a half years. Good. We understand that position. Fine. Thank you very much, Mr. McCoy. I wanted to address one or two points that were raised. There was an affidavit submitted by Norfolk Southern that was never addressed by the district court, and the affidavit was that Norfolk Southern would never have entered into this discounted contract without the assurances of getting the competitive traffic. I.e., 95%. Correct. Where is that in the record? The affidavit, I'm sorry, Your Honor. It is in the record. I just read it. Well, maybe both sides can submit correspondence giving us the points in the record that we're not... If you got 90% of the traffic, can you address the material breach issue based on the volume of traffic that you did get in relation to what you were supposed to get? Yes, because in essence, we were the only railroad in town for most of that 80% of the traffic. We were the only railroad that could service that traffic. So the competitive traffic, which was the essence of the entire deal, was obliterated. But counsel does a good job at pointing to the 80%, but it's a form over substance. We were going to move that traffic at a tariff rate anyway, and we lost the ability to charge that tariff rate because of their promise to give us the competitive traffic. So that 80%, the vast majority of it, we would have moved anyway at a much higher tariff rate. With respect to the standards of good faith and fair dealing, which were just recently discussed, it's interesting that the district court made a reference, and this is virtually a quote, that Bissell got caught creating a breach situation. And the question posed by the district court was, doesn't that impact good faith and fair dealing? That's a quote that the district court raised at oral argument. So despite all these other circumstances that warranted finding a material breach, the district court got off track somehow and seized on that one readily calculable damage component and never really considered these other points, even though they were favorable. Although good faith and fair dealing gets you to lost profits, does it not? I mean, that's a contractual remedy, whereas the only way you get to the published rates is through repudiation. Well, a material breach, if there was a material breach, the contract would end at the date of the material breach after the third is exposed. And then you're back on the tariff rates. Then we're back on the tariff rates. Same thing with repudiation. The remedy comes out to be the same. We would go back on tariff rates. Your Honor, you also raised that question as to jurisdiction. And in looking at that order, it does appear to be a final order of liability. There's a calculation that's left undone that says, if there's additional shipments, then the lost profits shall be done with the same formula. I'm not sure there's much left to rule on this. Well, we hope that's the case. Mr. Keenan, Mr. DeMichiel, thank you very much. The case was very well argued. Thank you for your attention. That is under advisement. The next matter is...